IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLETO SIQUEIROS,<br><br>    Petitioner,<br><br>v.<br><br>WILLIAM KNIPP, Warden,<br><br>    Respondent.<br>_____ | No. C 08-2939 MMC (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Cleto Siqueiros, who proceeds pro se and challenges the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse.

## I. PROCEDURAL HISTORY

In 2005, a Santa Clara County jury found petitioner guilty of two counts of lewd conduct with a child (Cal. Pen. Code § 288(a)), one count of aggravated sexual assault upon a child by way of forcible rape (Cal. Pen. Code § 269), and two counts of forcible lewd acts upon a child (Cal. Pen. Code § 288(b)). (CT 218-19.) On April 19, 2005, the trial court sentenced petitioner to 29 years to life in state prison. (CT 275-80.)

On July 6, 2007, in a reasoned opinion, the California Court of Appeal affirmed the judgment. (Ex. 10.)[1] On September 12, 2007, the California Supreme Court denied review. (Exs. 11-12.)

On November 5, 2007, petitioner filed in the California Supreme Court a petition for a writ of habeas corpus, which petition was summarily denied on April 30, 2008. (Exs. 13-14.)

On June 12, 2008, petitioner filed the instant petition for a writ of habeas corpus.

## II. STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

> The victim Y. was born in January of 1991. When she was nine-months old, her mother became romantically involved with [petitioner], and he moved in. Thereafter, he and Y.'s mother had three children.
>
> Y. testified about several incidents in which [petitioner] sexually abused her. The first incident occurred when she was in kindergarten. When she was in the bathroom, [petitioner] came in, fondled himself, and forced her hand onto his penis.
>
> When Y. was in the third grade, [petitioner] touched her three times. One time, he was driving her home from school. He stopped the car, grabbed her thighs, and told her that if she did not kiss him, he would not celebrate her birthday. She refused, and [petitioner] angrily drove home.
>
> When Y. was 10, she woke up one night, and [petitioner] was on top of her. Her sweatpants and underwear had been pulled down. [Petitioner] was holding her shoulders and pushing his penis into her vagina. It hurt, and she was shocked and scared. When [petitioner] left, she went to the bathroom and wiped blood and semen from herself. Three years later, a medical examination revealed vaginal narrowing that was consistent with a penetrating injury, which could have been caused by a penis, finger, or other object.
>
> In another incident around the same time, [petitioner] came into Y.'s bedroom. She was watching cartoons on TV. He grabbed her thighs with both hands, rubbed between her legs, and then grabbed and rubbed her breasts. [Petitioner] seriously warned her not to tell anyone. Sometime after the incident, the family moved to Reno. There, [petitioner] came into her room one day and touched her legs and thighs.
>
> Later, the family moved back to San Jose, where again, [petitioner] came into her room one night and rubbed her thighs. When she was in the sixth grade, [petitioner] offered to give her money if she allowed him to touch her. He told

---

[1] Except as otherwise specified, all references herein to exhibits are to exhibits submitted by respondent in support of the Answer.

2

her if she told anyone, no one would believe her.

When Y. was in middle school, she started to argue and get into trouble with her parents for various reasons. Among other things, they were concerned about drugs and her friends. One day, Y.'s mother found methamphetamine in her backpack. Y. claimed that another girl put the drugs there.[2] Y's mother and [petitioner] took her to a medical clinic to be tested for drugs and sexual activity. Y. was very upset that her parents did not believe her. Doctor Antonia Zuzueta insisted that she and Y. be alone during the examination. [Petitioner] reluctantly agreed. Y.'s drug test came back negative. However, Y. told Doctor Zuzueta that three years before, she had had sex with [petitioner]. Doctor Zuzueta reported the allegation to Child Protective Services, and later [petitioner] was arrested.

Detective Juan Serrano of the San Jose Police Department interviewed [petitioner]. Initially he denied any improper conduct. Later, however, he admitted that once he accidentally entered the bathroom when Y. was there. Ultimately, he admitted touching her, masturbating while he did so, and then smearing his semen on her. He said that his finger may have digitally penetrated her. However, he explained that Y. initiated the encounter because she wanted to see how it felt. She told him it felt good although a little painful. He said that when they finished, she demanded money.

### *Expert CSAAS Testimony*

Carl Lewis, a criminal investigator for the district attorney, testified as an expert on CSAAS [Child Sexual Abuse Accommodation Syndrome]. He testified that CSAAS is not a scientific or diagnostic instrument used to establish that abuse has taken place. Rather, is [sic] descriptive tool that offers an explanation for certain behaviors exhibited by children who have been sexually abused that might appear to be inconsistent with common notions about how a child victim would act. Among those behaviors are secrecy about the abuse; helplessness to do anything about it; entrapment by and accommodation of the abuser; delayed conflicted, and unconvincing disclosure of abuse; and retraction of previous accusations. He testified that accommodation behavior can account for a child victim acting as if nothing is wrong, engaging in compensatory behavior like rebelliousness, and performing poorly in school. CSAAS can explain delays in disclosing abuse and the sort of things that might trigger later disclosure, such as being disciplined. CSAAS can also explain why victims may later try to retract accusations under pressure from family members or concern about the consequences.

### *The Defense*

[Petitioner] testified that he touched Y. inappropriately on only one occasion, when she was 10 years old. He said that Y. had seen couples touching on TV and told him she wanted to know what it felt like. She pulled her pants down and asked him to touch her over her underpants. He touched her stomach, and she then moved his hand to her vagina. He masturbated while touching her

---

[2] [Petitioner's] 15-year old niece Betty testified that in November 2004, Y. called and asked if she knew anyone who could sell her $30 to $40 worth of methamphetamine. Betty further testified that she had seen Y. smoke methamphetamine on prior occasions.

3

> until he ejaculated. After the incident, Y. asked him for money. He said he refused, saying it would be wrong. He denied penetrating her vagina with either his finger or penis.
>
> [Petitioner] testified that Y. falsely accused him because she was angry that he had disciplined her and restricted her activities. He testified that when he and Y.'s mother took her to be examined, Y. was angry and rude, and he hit her.

(Ex. 10 at 2-5.)

## III. DISCUSSION

A. <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." <u>Penry v. Johnson</u>, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." <u>Williams</u>, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

4

prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

On direct review and state habeas review, the state courts did not discuss the merits of the claims petitioner raises in the instant petition. The United States Supreme Court has recently clarified that a federal habeas court, in applying the review provisions of 28 U.S.C. § 2254(d), looks to the result reached by the highest state court, and that the absence of reasoning does not prevent application of the standard of review set forth in § 2254(d). See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

B.  Petitioner's Claims

Petitioner asserts the following claims for relief: (1) ineffective assistance of trial counsel for failure to rebut a prosecution expert; (2) ineffective assistance of trial counsel for failure to present witnesses, specifically petitioner's relatives, to impeach the credibility of the victim; (3) ineffective assistance of appellate counsel for failure to challenge on appeal the validity of petitioner's sentence; and (4) cumulative error. The Court addresses each claim in turn.

//
//
//
//

5

1. Ineffective Assistance of Trial Counsel – Expert Witnesses

Petitioner claims trial counsel was ineffective by failing to "rebut the expert witness used by the prosecution." (Dkt. No. 1 at 10-20.)[3] At trial, physician assistant Mary Ritter ("Ritter") testified for the prosecution as to findings she made in connection with a sexual assault examination of the victim. Ritter testified she observed an "irregular notch" on the victim's hymen and "less hymenal tissue" at the point of the notch. (RT 251.) Ritter explained that the narrowing of the hymenal tissue was indicative of a "penetrating injury that's had time to heal." (RT 252-54.) Petitioner claims defense counsel failed to: (1) "call to the stand an expert witness" for the defense to "rebut" Ritter; and (2) "subject [ ] Ritter to a proper cross-examination." (Dkt. No. 1 at 10, 14.)

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the Strickland test "if the petitioner cannot even establish incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged

---

[3] The page numbers used herein for Dkt. No. 1 and Dkt. No. 1-1 refer to those affixed to the top of the page by the court's electronic filing program.

6

deficiencies." Strickland, 466 U.S. at 697.

A "doubly" deferential judicial review applies in analyzing ineffective assistance of counsel claims under 28 U.S.C. § 2254. See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11 (2011). The rule of Strickland, i.e., that a defense counsel's effectiveness is reviewed with great deference, coupled with AEDPA's deferential standard, results in double deference. See Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010). Put another way, when § 2254(d) applies, "the question is not whether counsel's actions were reasonable[;] [t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 131 S. Ct. 770, 788 (2011). Moreover, because Strickland's standard for assessing defense counsel's effectiveness is a "general" one, state courts have "greater leeway in reasonably applying [that] rule," which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." See Cheney, 614 F.3d at 995 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

To succeed on a claim that counsel was ineffective in failing to call a favorable witness, a federal habeas petitioner must identify the witness, provide the testimony the witness would have given, show the witness was likely to have been available to testify and would have given the proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony been introduced, the jury would have reached a verdict more favorable to the petitioner. See Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003). A petitioner's mere speculation that the witness would have given helpful information if interviewed by counsel and called to the stand is not enough to establish ineffective assistance. See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).

In Dows v. Wood, 211 F.3d 480 (9th Cir. 2000), the Ninth Circuit denied a petitioner's claim that his counsel had been ineffective in failing to investigate and call a witness, where the petitioner provided only his own "self-serving affidavit" and no other evidence, such as "an affidavit from [the] alleged witness," that the witness would have given helpful testimony. See id. at 486-87; cf. Alcala, 334 F.3d at 872 & n.3 (distinguishing,

7

inter alia, Dows; finding ineffective assistance of counsel where petitioner submitted interviews reflecting testimony absent witnesses would have provided). As with the petitioner in Dows, petitioner here offers no evidence showing any proposed defense expert would have provided favorable testimony. Nor does petitioner provide any evidence demonstrating any such expert witness was available to testify at trial.

Petitioner claims that a Dr. Lee Coleman ("Coleman") was an available expert. (Dkt. No. 1 at 13.) According to petitioner, Coleman is "an expert in the study of the physical evidence surrounding sexual abuse claims in children." (Id.) Petitioner came across Coleman's name in the Ninth Circuit's opinion in Franklin v. Henry, 122 F.3d 1270 (9th Cir. 1997), overruled by Payton v. Woodford, 299 F.3d 815 (9th Cir. 2002). Franklin was a federal habeas action arising from a conviction for child sexual abuse obtained in a trial in which both Ritter and Coleman testified as experts – Ritter for the prosecution and Coleman for the defense. Franklin is of no assistance to petitioner here. As noted above, irrespective of Coleman's role in the Franklin case, petitioner fails to show Coleman was available and willing to testify for the defense at petitioner's trial, nor does petitioner provide an affidavit from Coleman, or any other evidence showing the testimony Coleman would have given. See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) (noting "[s]peculation about what an expert could have said is not enough to establish prejudice").

Petitioner's claim that defense counsel failed to subject Ritter to a proper cross-examination likewise fails. As his sole support for such claim, petitioner again relies on Franklin. Specifically, petitioner points out that, in the Franklin case, Ritter gave expert testimony similar to the testimony she gave in the instant case, as reflected in the following excerpt from Franklin:

> [The victim] later was interviewed by Mary Ritter, a "physician assistant" at the Center for Child Protection at Santa Clara Valley Medical Center. Under Dr. David Kerns she did the medical evaluation of children alleged to have been sexually abused. In particular, she examined [the victim's] hymen, the mucous membrane at the opening of the vagina which at her age would be "delicate and thin" and "very sensitive" Ritter noted that [the victim's] hymenal rib was "narrower than I would expect in a child her age." She also observed in conjunction with the narrowing, a "slight asymmetry of the hymenal tissue." The significance of these signs was that they had "the appearance of a hymen

8

that has been injured and has healed. . . . Injured by penetration."

Franklin, 122 F.3d at 1271 (citations to record omitted).

Petitioner next points out that in Franklin, "four (4) experts, including [ ] Ritter's supervisor, found that the victim's hymen DID NOT exhibit penetration." (Dkt. No. 1 at 12 (emphasis in original).) In that regard, petitioner relies on the following excerpt from Franklin:

> A pediatrician who examined [the victim] for a bladder infection during the time in question saw no signs of sexual abuse. A psychiatrist, Dr. Lee Coleman, who had made study of the physical evidence of sexual abuse, found her hymen to be normal, i.e., not affected by penetration. A gynecologist, Dr. Jack Silveria, also found her hymen to be normal. The director of the Center for Child Protection at Santa Clara Valley Medical Center, Dr. David Kerns, who testified for the prosecution, conceded on cross that [the victim's] hymen was in the upper range of normal.

Franklin, 122 F.3d at 1271. Petitioner argues defense counsel should have subjected Ritter "to a cross-examination regarding this previous opinion," which would have shown "Ritter's opinions have been called into question in at least one other case." (Dkt. No. 1 at 14-15.)

Petitioner's reliance on the above-quoted excerpts from Franklin is unavailing, as the record shows defense counsel was not ineffective in the manner in which he challenged Ritter's findings. On questioning by defense counsel, Ritter admitted she could not specify with any certainty the cause of the victim's hymenal changes (RT 261, 269-71) and, in addition, conceded she was relying on "a somewhat subtle finding" of injury (RT 269). Also on cross-examination, Ritter agreed with defense counsel's description that a reliable "normative study" showed "[t]here had been some terrible mistakes made in the past by experts coming into court and testifying that this is definite abuse" (RT 263), and further conceded that significant percentages of girls have normal variations in their hymenal tissue that have been incorrectly identified as evidence of sexual abuse (RT 262-69).

Even assuming, arguendo, defense counsel would have been allowed to elicit through Ritter's testimony the opinions of other experts who testified in the Franklin case, the state court's conclusion that defense counsel's conduct was reasonable is not an incorrect application of Supreme Court precedent or an unreasonable determination of fact, such as to

9

warrant habeas relief under AEDPA. A federal habeas court must "give 'great deference' to 'counsel's decisions at trial, such as refraining from cross-examining a particular witness.'" Brown v. Uttecht, 530 F.3d 1031, 1036 (9th Cir. 2008) (quoting Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000)). Choices regarding cross-examination of government witnesses are strategic and given wide latitude. See United States v. Rodriguez-Ramirez, 777 F.2d 454, 458 (9th Cir. 1985). An examination that extends beyond the immediate case may well open the door to unfavorable evidence otherwise inadmissable.[4] See, e.g., Brodit v. Cambra, 350 F.3d 985, 994 n.3 (9th Cir. 2003) (holding state court reasonably concluded trial attorney provided effective assistance where attorney declined to present evidence favorable to defense out of concern it would open the door to unfavorable evidence).

Moreover, petitioner cannot show he was prejudiced by the claimed ineffective cross-examination. As discussed above, the victim testified in great detail about her sexual abuse by petitioner, and although petitioner initially denied having molested the victim, he later admitted he had touched her vagina "over her underpants," (RT 364-66) and that while doing so, masturbated and then "put [his] ejaculated hand on her part . . . under [her] underpants." (RT 367-72.) Given such evidence, it cannot be said the result of the proceeding would have been different had defense counsel cross-examined Ritter as to her testimony in a different case. See Strickland, 466 U.S. at 694.

In sum, petitioner has not demonstrated his trial counsel was ineffective in his cross-examination of Ritter or that the result of his trial would have been different had the cross-examination been conducted differently.

Accordingly, petitioner is not entitled to habeas relief on this claim.

---

[4] Petitioner states Ritter "had given between 150 and 200 opinions during judicial proceedings" (Dkt. No. 1 at 15), but points to no case other than Franklin in which Ritter's opinion was challenged.

10

2. <u>Ineffective Assistance of Trial Counsel – Failure to Call Petitioner's Relatives</u>

Petitioner claims defense counsel rendered ineffective assistance by not calling petitioner's brother, Ramon Siqueiros ("Ramon"), and petitioner's wife, Micaela Morales ("Morales"), to testify on petitioner's behalf. (Dkt. No. 1 at 21-28.) In support thereof, petitioner claims the victim testified at trial that Ramon and Morales "were witnesses to some of the events in question" (Dkt. No. 1 at 21) and submits sworn declarations from Ramon and Morales stating: (1) such testimony by the victim was not true; (2) they alerted defense counsel that they wanted to testify on petitioner's behalf as to the victim's untruthfulness; and (3) defense counsel did not call them to testify as to the truthfulness of the victim's allegations. (Dkt. No. 1-1 at 14-15, 22-23.) The Court addresses each witness separately.

a. <u>Ramon Siqueiros</u>

The victim testified at trial that the following events occurred the morning after she was raped at the age of ten years:

Q: When you woke up in the morning, did you see anybody when you woke up?

A: Well, I don't know where was he [sic], but then my uncle Ramon came in.

Q: Your uncle Ramon came into the room?

A: Yes.

Q: And that was the next morning?

A: Yeah.

Q: And did he say something to you?

A: Well, he -- well, he said he -- well, my pants were like not -- I don't know how to say it.

Q: Okay. I know that you sometimes speak in Spanish; is that right [Y]?

A: Yes.

Q: When you woke up the next morning, were your underpants and pants all the way up?

A: No.

Q: Where were they?

11

1     A: They were like up to my knee or something like that.

2     Q: Up to your knees?

3     A: To my thighs.

4     . . .

5     Q: What did your uncle Ramon say to you?

6     A: Why were my pants down.

7     Q: What did you say?

8     A: Nothing. I don't know.

9     Q: Did you tell your uncle Ramon what had happened that night?

10    A: No.

11    Q: How come?

12    A: I didn't want to. I don't know. I don't know why I didn't.

13    Q: How come you didn't want to?

14    A: 'Cause, I was scared. I don't know.

15 (RT 140-41.)

16     In support of the instant petition, Ramon has submitted a sworn declaration, stating in

17 relevant part:

> It was being testified to by my brother's step-daughter prior to my brother's trial and at the trial that I had witnessed her in bed with her pants down, and I had asked her what was going on. This statement is not true. I never witnessed such a thing and I told my brother's attorney that I wanted to testify on my brother's behalf, but I was never called to testify.

21 (Dkt. No. 1-1 at 14-15.) Petitioner claims defense counsel should have called Ramon to so

22 testify at the trial. (Dkt. No. 1 at 22-26.)

23     Assuming Ramon informed defense counsel as he states and asked to testify as

24 indicated, trial counsel could have had a reasonable tactical reason for not presenting such

25 evidence. First, the testimony would, at best, have called into question the victim's account

26 of a relatively brief encounter with a relative following one of a number of instances of abuse

27 and occurring several years before the trial. Further, because Ramon is petitioner's brother,

28 any testimony he gave was readily subject to impeachment for bias. See Bergmann v.

12

McCaughtry, 65 F.3d 1372, 1380 (7th Cir. 1995). (noting, "[a]s a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias").

Moreover, petitioner fails to demonstrate prejudice. Any contradiction of the victim's testimony on this one point was not likely to have significantly impacted her credibility. Consequently, petitioner has not shown "the result of the proceeding would have been different" had defense counsel called Ramon to testify. See Strickland, 466 U.S. at 694.

          b.      Micaela Morales

Morales, as noted, is petitioner's wife and the victim's mother. The victim testified at trial to the following events occurring with regard to a different incident of abuse:

Q: And he came into the room, right?

A: Um-hum.

Q: And I'm sorry, did you say at that point, you stood up or were you still sitting down?

A: At that point, I was sitting down, but then I saw him came in [sic], and I stood up.

Q: And when you stood up, did you go somewhere or did he come to you? What happened next?

A: Well, he came to me and grabbed my chest and then I just backed away. And he say if I tell somebody, something was going to happen, something like that.

. . .

Q: Later on that day, did you tell somebody?

A: I remember -- was it that day or days after, I told my mom and then --

Q: What did you tell your mom?

A: That he came in the room and grabbed my chest.

. . .

Q: And you said that at that point, or at some point thereafter, she and your stepdad, the defendant, got into a fight?

A: Yes.

(RT 147-48.)

13

The victim also testified to the following with regard to the incident of abuse occurring around the time she was in kindergarten:

Q: What were you doing when he came in?

A: Putting my pants up.

Q: You finished using the toilet?

A: Yes.

Q: And when he came in when you were pulling your pants up, what did he do?

A: He was just staring at me. He was staring at me.

. . .

Q: What happened next?

A: He had pulled his pants down and he just grabbed his penis.

Q: He pulled his pants down and grabbed his penis?

A: Yes.

Q: What happened next?

A: He was -- he was just touching his penis and at some point my mom just came in.

Q: [Y], before your mom came in, did your hand ever go on his penis?

A: Yes.

Q: How did your hand get on his penis?

A: Well, he grabbed my hand, put it on his penis.

Q: Was his penis -- how did his penis feel at that point?

A: Hard.

. . .

Q: You said at some point your mom came in?

A: Yes.

Q: When your mom came in, was your hand still on his penis?

A: No.

Q: Were his pants still down when your mom came in?

1     A: Yes.

2     Q: What happened next after your mom came in?

3
4     A: Well, my mom came in and then I just pulled my pants up and he did too, and she saw us putting our pants up. And then when my mom, she was -- she was mad. And then they started arguing and I just got out.

5 (RT 156-58.)

6     In support of the instant petition, Morales has submitted a sworn declaration, stating in

7 relevant part:

8
9
10
11
12     After my husband's arrest I began to realize that my daughter was making up stories claiming that my husband had molested her. I knew her allegations were false due to the fact my daughter claimed that I had witnessed some of these claimed molestations and argued with my husband over his actions. None of what my daughter claimed was true. I did not witness any such actions on the part of my husband and I told his attorney that I wanted to testify at the trial. While I was called to testify I was never asked any questions regarding the lies told by my daughter, and I don't know why the attorney never asked these questions.

13 (Dkt. No. 1-1 at 22-23.) Petitioner claims defense counsel should have elicited such

14 testimony from Morales at trial. (Dkt. No. 1 at 24-26.)

15     Counsel, however, could have concluded Morales' testimony was not as damaging to

16 the victim's credibility as petitioner now claims. First, in the declaration Morales submits in

17 support of the instant petition, she only alludes generally to "claimed molestations" and "lies

18 told by my daughter" (Dkt. 1-1 at 22-23); nowhere does Morales specifically state she was

19 prepared to dispute the victim's account of the chest-grabbing incident or the assault that took

20 place in the bathroom. Further, Morales' own credibility, as discussed below, was subject to

21 question.

22     The record shows that, prior to trial, the prosecutor requested an evidentiary hearing

23 outside the presence of the jury, under California Evidence Code section 402, to determine the

24 admissibility of Morales' testimony concerning a phone conversation she overheard between

25 the victim and an unknown person, which conversation took place the day afer petitioner was

26 taken into custody on the present offenses. (RT 303-04, 309.)

27     At the above-referenced hearing, Morales testified that the victim came home from

28 school and took Morales' phone. (RT 316.) Morales also testified that another relative,

15

Marcella, was in the house, and Morales said to Marcella, "'Let's go listen to the conversation that my daughter's going to have.'" (RT 317, 319.) Morales then gave the following testimony:

> Q: And then what happened after you said that?
>
> A: She [Marcella] came out and then we went in the back to listen to the call that she [the victim] was making.
>
> Q: Was the window opened or closed?
>
> A: The glass was open, but she had a curtain.
>
> Q: What happened after you went there?
>
> A: Well, what she was saying is that she had said that it was [petitioner] and that she was not going to change that or that she was not going to change the conversation.

(RT 318.)

The defense sought to introduce such testimony as supporting "an inference" that the victim "had fabricated the initial allegation against her stepdad." (RT 324.) The prosecutor objected to the testimony as inadmissible hearsay. (Id.) The trial court overruled the objection, after which the prosecutor informed the court and defense counsel that the prosecution would call the defense investigator as a rebuttal witness if Morales testified. (RT 324-25.) The prosecution was aware that Morales, in an interview with the defense investigator, stated she had asked Marcella to accompany her because the victim was speaking in English during the phone conversation, and she "wanted Marcella to listen and help her understand what [the victim] was saying." (RT 309.) At the evidentiary hearing, Morales denied telling the defense investigator she had asked Marcella to translate for her, but she also admitted that some of the phone conversation was in English, and conceded: "[W]hen [the victim] spoke in English, we didn't understand anything." (RT 320-21.)

Given such concessions, the Court finds trial counsel could have made a reasonable tactical decision not to call Morales to testify before the jury. Moreover, as noted, the prosecutor planned to call not only a witness, but a witness aligned with the defense, to discredit Morales. Further, there was a risk that the prosecutor could use Morales' testimony

to his advantage if Morales were put on the stand. In particular, the overheard portion of the phone conversation could be viewed as corroborating the victim's testimony that petitioner had sexually assaulted her. Under such circumstances, counsel cannot be deemed ineffective in not eliciting Morales' testimony about the phone call. See, e.g., Brodit, 350 F.3d at 994 & n.3 (finding defense counsel not ineffective where favorable evidence could open door for introduction of unfavorable evidence).

In sum, the decision not to introduce Morales was a judgment call, and not one that clearly falls below an "objective standard of reasonableness." Strickland, 466 U.S. at 688.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 3. Ineffective Assistance of Appellate Counsel

Petitioner claims the prosecutor originally charged petitioner with one count of continuous sexual abuse of a child under California Penal Code section 288.5, but later, during the trial, was improperly allowed to amend the information to replace that count with three separate counts of committing lewd acts upon a child, under section 288(a). (Dkt. No. 1 at 30–Dkt. No. 1-1 at 5.) Thereafter, as noted, petitioner was convicted of two counts of violating section 288(a); he was sentenced to six years on one of those counts and two years on the other. (Id.) Petitioner claims the prosecutor was not entitled to amend the information to charge three separate counts of section 288(a) and, consequently, that appellate counsel provided ineffective assistance by failing to challenge said amendment and resulting sentence. (Id.)[5]

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant effective assistance of counsel on his first appeal. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland. See Strickland, 466 U.S. at 668; Miller v. Keeney, 882

---

[5] Penal Code section 288.5 requires proof that a person who "resides in the same home with the minor child" engaged in "three or more acts of lewd or lascivious conduct, as defined in Section 288." Cal. Pen. Code § 288.5. Petitioner claims he would have been acquitted of said charge because the jury ultimately only convicted him of two of the three counts of lewd or lascivious acts charged under Penal Code section 288 in the amended information. (Dkt. No. 1-1 at 1.)

17

F.2d 1428, 1433 (9th Cir. 1989). A petitioner thus must show his counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Miller, 882 F.2d at 1434 & n.9.

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a criminal defendant. Jones v. Barnes, 463 U.S. 745, 751-54 (1983). "[T]he weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." Miller, 882 F.2d at 1434. Consequently, where appellate counsel "decline[s] to raise a weak issue," he or she will "frequently remain above an objective standard of competence" and, for the same reason, will have caused his client no prejudice. Id.

Here, the record does not reflect any objection by petitioner's trial counsel to the amendment of the information. (See CT 134B-134C; RT 404-05.) Under California law, the failure to raise an objection to the amendment of an information bars review on appeal. People v. Carrasco, 137 Cal. App. 4th 1050, 1056 (2006); People v. Collins, 217 Cal. App. 2d 310, 313 (1963). Because the issue of the subject amendment was not preserved for appeal, appellate counsel was procedurally barred from raising a claim based on that amendment and thus was not deficient in failing to do so.

Further, California Penal Code section 1009, provides in relevant part:

> The court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint, for any defect or insufficiency, <u>at any stage of the proceedings</u> . . .

Cal. Pen. Code § 1009 (emphasis added). Petitioner points to no case authority precluding the prosecution from amending to conform to proof, under the circumstances pertaining here or otherwise, nor does petitioner argue the prosecution's evidence on the amended charges, if accepted, was insufficient to support a conviction thereon. Consequently, a claim that the amendment of the information was improper, even if preserved, is likely to have failed on appeal.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 4. Cumulative Error

Petitioner claims he was prejudiced by the cumulative effect of the foregoing asserted errors. (Dkt. No. 1-1 at 6.) For the reasons discussed above, the Court has found no constitutional error exists, let alone multiple errors. As there have been no errors to accumulate, there can be no due process violation based on a theory of "cumulative" error. See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (holding where there are no errors, there can be no cumulative error).

Accordingly, petitioner is not entitled to habeas relief on this claim.

### C. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward; [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

//
//
//
//
//
//
//

## IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED and a certificate of appealability is hereby DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

DATED: June 25, 2012

_____
MAXINE M. CHESNEY
United States District Judge